UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT JOSEPH GARDNER,

          Petitioner,

    v.

WILLIAM MUNIZ, et al.,

          Respondents.

Case No.  16-cv-02663-EMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

      Petitioner Robert Joseph Gardner has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Mr. Gardner was convicted in state court of murder, torture, burglary, and grand theft.  Mr. Gardner seeks to overturn his conviction on the grounds that (1) he was improperly denied the constitutional right to represent himself and (2) his constitutional right not to incriminate himself was violated.  Having considered the parties' briefs and accompanying submissions, the Court hereby **DENIES** Mr. Gardner's petition.

## I.    FACTUAL & PROCEDURAL BACKGROUND

      In March 2012, a jury found Mr. Gardner guilty of four different crimes: the murder of Eric Bean on or about December 20, 2009; the torture of Eric on the same date; burglary on or about December 17, 2009; and grand theft of firearms on the same date.  The evidence presented to the jury reflected as follows, as indicated in the state appellate court opinion affirming Mr. Gardner's conviction.

      On December 17, 2009, Eric's father discovered that someone had broken into his gun safe and taken multiple firearms.  The gun safe had been pried open, but the front and back doors of the residence where the safe was kept showed no signs of forced entry.

      Four days later, on December 21, 2009, a bicyclist discovered Eric's dead body.  Marks on

his body indicated that he had been tied and beaten.  It was later determined that Eric had been murdered at the Benicia residence of Timothy Delosreyes, Jr., also known as "Big Tim."  Big Tim has a son, Timothy Delosreyes III, who is also known as "Little Tim" or "Timmy."  On December 30, 2009, the police first questioned Mr. Gardner about potential involvement with the crimes. Mr. Gardner acknowledged knowing both Eric and Little Tim but claimed that he did not know anything about Eric's death.  Mr. Gardner stated that, on December 20 and 21, 2009, he was in San Francisco.  After Mr. Gardner was told that his cell phone records did not corroborate his presence in San Francisco, he had no explanation.

Several months later, on March 6, 2010, the police arrested Mr. Gardner, as well as Big Tim, Little Tim, and Mr. Gardner's wife, Melody Rives.  The police also interviewed Mr. Gardner a second time on the same date.  During the interview, Mr. Gardner stated that he and Big Tim were in Vallejo on December 19, 2009.  The next morning, December 20, 2009, both Melody and Little Tim called Mr. Gardner.  Mr. Gardner and Big Tim then drove from Vallejo to Big Tim's residence in Benicia.  Melody, Little Tim, and Eric were all present at the residence.  Eric was in a bedroom, beaten and hogtied.  Mr. Gardner stated that Eric and Little Tim had stolen some guns, and Melody told Mr. Gardner that Eric was going to "squeal."  Mr. Gardner estimated that Eric died later, about 10:30 to 11:00 a.m. that day.  He helped Little Tim dispose of Eric's body, and he gave Little Tim advice about cleaning the residence.

The March 6 arrest and interview took place on a Saturday.  Several days later, on March 10, 2010 (a Wednesday), the police finished interviewing Big Tim, Little Tim, and Melody and thereafter went to interview Mr. Gardner a third time.  During this interview, Mr. Gardner admitted that he had helped Eric and Little Tim steal the guns from Eric's father's house.  Mr. Gardner also stated that, when he got to the Benicia residence on December 20, 2009, Melody told him that Eric was going to "snitch" to his father about the stolen guns.  Although Mr. Gardner denied punching or kicking Eric, he did tell Little Tim that Eric needed to be tied up more.  *See* 4 CT 960, 964 (stating, *inter alia*, that "I had little Timmy do it . . . to tie him up a little bit more"; also stating "I was like, 'You might need to do the feet a little bit more . . . .'").  He also told Little Tim that, "if you tie somebody up . . . , then you can't let them go" because "it's just gonna get

United States District Court
For the Northern District of California

1  deeper and deeper.  You know, 'cause that is kidnapping and all that – it's binding – all the

2  charges on there."  4 CT 964, 966.  Mr. Gardner indicated that he wanted Eric to die "smoothly"

3  and not suffer.  4 CT 965.

4  　　　　As part of the defense case, Melody testified.  She testified, *inter alia*, that, on the day at

5  issue, she never saw Mr. Gardner in the bedroom where Eric was tied up.  *See* 5 RT 913.  She also

6  stated that, at one point, Mr. Gardner escorted her outside.  *See* 5 RT 921.  While the two were

7  outside, she heard "heavy noises" coming from inside the residence and then, after a few minutes,

8  there were no more noises.  5 RT 921-22.

9  　　　　In its rebuttal case, the state challenged Melody's trial testimony by offering the testimony

10  of Sergeant Tiffany Hook.  Sgt. Hook had interviewed Melody on several prior occasions – more

11  specifically, on December 29, 2009; March 6, 2009; and March 10, 2009.  Sgt. Hook testified that,

12  during the last interview, Melody stated that Mr. Gardner had tightened Eric's restraints.  Melody

13  also stated that she overheard a conversation between Mr. Gardner and Big Tim during which

14  "Big Tim instructed [Mr.] Gardner to tighten the restraints because Little Timmy didn't know

15  what he was doing."  6 RT 987.

16  　　　　After considering, *inter alia*, the above evidence, the jury convicted Mr. Gardner of

17  murder, torture, burglary, and grand theft.  Mr. Gardner subsequently appealed the convictions.

18  On November 21, 2014, the appellate court largely affirmed the judgment.  In particular, the court

19  rejected Mr. Gardner's arguments that (1) the trial court improperly denied his request for self-

20  representation and (2) the trial court improperly failed to suppress statements that he had made

21  during the last police interview, held on March 10, 2009.  *See generally* Ex. A.  Mr. Gardner then

22  petitioned the California Supreme Court for review but his petition was summarily denied on

23  February 18, 2015.  *See* Ex. B.

24  　　　　Having exhausted his state remedies, Mr. Gardner now petitions this Court for relief

25  pursuant to 28 U.S.C. § 2254.

26  ///

27  ///

28  ///

**United States District Court**
For the Northern District of California

## II.  DISCUSSION

A.      Legal Standard

Mr. Gardner's case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under AEDPA, habeas relief may be granted if the state court proceedings resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" or "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1)-(2).

> In cases where a petitioner identifies clearly established federal law and challenges the state court's application of that law, our task under AEDPA is not to decide whether a state court decision applied the law correctly.  Rather, we must decide whether the state court decision applied the law reasonably.  If the state court applied the law reasonably, we must deny relief.  Thus, relief is proper only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

*Hedlund v. Ryan*, 750 F.3d 793, 799 (9th Cir. 2014); *see also Williams v. Talor*, 529 U.S. 362, 411 (2000) ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

B.      Sixth Amendment Claim

Mr. Gardner argues first that he is entitled to habeas relief because the trial court improperly denied his request to represent himself, in violation of his Sixth Amendment rights.  At the trial level, the state court found that, although Mr. Gardner was mentally competent to stand trial, he was not mentally competent to represent himself.

In evaluating Mr. Gardner's argument, the Court takes guidance from *Indiana v. Edwards*, 554 U.S. 164 (2008), which addresses the situation in which a criminal defendant is found mentally competent to stand trial but not mentally competent to conduct the trial himself.  The question in *Edwards* was whether a state could lawfully insist that the defendant proceed to trial with counsel, without violating the defendant's right to self-representation.  *See id.* at 167 (citing *Faretta v. California*, 422 U.S. 806 (1975)).

4

**United States District Court**
For the Northern District of California

The Supreme Court held that a state may, in fact, deny a defendant's request to represent himself where that the defendant lacks the mental capacity to conduct the trial, a standard which differs from the standard for competency to stand trial. *See id.* at 174. The Court reasoned as follows.

"First, the Court's precedent, while not answering the question, points slightly in the direction of [an] affirmative answer." *Id.* at 175. In fact, "*Faretta*, the foundational self-representation case, rested its conclusion in part upon pre-existing state law set forth in cases all of which are consistent with, and at least two of which expressly adopt, a competency limitation on the self-representation right." *Id.*

Second, it did not make sense for there to be a single standard that would govern both competency to stand trial and competency to represent oneself at trial. "Mental illness is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." *Id.* Thus, "[i]n certain instances an individual may well be able to satisfy [the] mental competence standard, for which he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Id.* at 175-76 (indicating that such tasks include "organization of defense, making motions, arguing points of law, participating in *voir dire*, questioning witnesses, and addressing the court and jury").

Notably, in support of the above point, the Court pointed to an amicus brief filed by the American Psychiatric Association (APA), which stated – "without dispute" – that "'disorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant.'" *Id.* at 176.

Third, "a right of self-representation at trial will not 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel." *Id.* "Moreover, insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's

criminal law objectives, providing a fair trial." *Id.* at 176-77.

Based on the above, the Supreme Court concluded that "the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." *Id.* at 177-78.  The Court underscored that the trial judge "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id.* at 177.

In the instant case, the trial judge asked a third-party expert, Dr. Jessica Ferranti,[1] to conduct a psychiatric evaluation of Mr. Gardner for the purpose of determining (1) whether he was competent to stand trial and (2) whether he was competent to represent himself.  *See generally* Ex. D (report of Dr. Ferranti); *see also* 1 RT 2 (defense counsel asking for evaluation of Mr. Gardner because "I have seen some reasons, over the past several months, where he is declining and unable to assist me with his defense, and my client informs me that today he would like to proffer a Faretta motion").  For the evaluation, Dr. Ferranti performed a mental status examination and administered a cognitive assessment test as well as a test for competency to stand trial.  Dr. Ferranti also asked specific questions of Mr. Gardner targeted at his competency to represent himself.

Based on the examination, tests, and questions, Dr. Ferranti diagnosed Mr. Gardner, as of July 18, 2011, with alcohol abuse,[2] amphetamine dependence (in full sustained remission in a controlled setting),[3] antisocial personality disorder, and – most notably for purposes of this opinion – expressive language disorder.  *See* Ex. D (Ferranti Rpt. at 10).

---

[1] Dr. Ferranti is an assistant clinical professor in the Department of Psychiatry & Behavioral Sciences at the University of California, Davis Medical Center.

[2] Dr. Ferranti did not diagnose alcohol dependence because she "was not able to elicit substantive evidence of withdrawal symptoms related to alcohol or tolerance to alcohol."  Ex. D (Ferranti Rpt. at 10).

[3] In her report, Dr. Ferranti noted that Mr. Gardner had self-reported "experiencing classic withdrawal[] symptoms related to methamphetamine when he reported 'crashing' and sleeping for many days at a time after using methamphetamine.  Mr. Gardner [also] reported tolerance to the effects of methamphetamine leading to increased quantity of usage over time."  Ex. D (Ferranti Rpt. at 11).

United States District Court
For the Northern District of California

Regarding expressive language disorder, Dr. Ferranti noted, *inter alia*, as follows:

- Mr. Gardner had "deficits in abstract thinking, learning new information and problem solving." Ex. D (Ferranti Rpt. at 12).

- "Mr. Gardner demonstrated great difficulty with expressing his thoughts and ideas, often resorting to odd references, strange wording or imprecise analogies. For example, when meaning to say 'It's in the cards . . . ,' he struggled to find this language and instead said, 'It's in the deck, you know the "deck" . . .' He later clarified this to mean 'the deck of cards' but he was unable to come up with this expression in real time conversation. His expressive problems were so prominent as to cause significant speech disorganization that was very hard for [the] examiner to follow at times." Ex. D (Ferranti Rpt. at 12).

- "Although Mr. Gardner's knowledge of language was occasionally sophisticated,[4] his expressive deficits (along with other cognitive deficits such as lack of ability for abstraction) prevented him from using language effectively. He was not articulate. This impairment was notable and the most prominent functional deficit on examination." Ex. D (Ferranti Rpt. at 12).

- "Mr. Gardner manifests word finding difficulty. This was present in my examination . . . and is also evidenced in the transcripts of the police interviews I was provided. Again, he struggles with expressing himself, eventually doing so but with great effort on both his part and the part of those interviewing him." Ex. D (Ferranti Rpt. at 12).

Ultimately, Dr. Ferranti opined that Mr. Gardner was competent to stand trial but that he was not competent to represent himself because of his expressive language disorder.

> 1. Due to an Expressive Language Disorder, Mr. Gardner cannot communicate coherently enough to make [a] presentation to the Court. It is my medical opinion that he will not be able to communicate with the Court or a jury with sufficient clarity to make himself understood in real time during trial. It is likely that Mr. Gardner would be significantly disadvantaged due to his mental impairment. Notably, Mr. Gardner has acknowledged that he is aware of

---

[4] "For example, his spontaneous use of words such as 'litigation,' 'suppress,' 'toll,' 'persuade,' 'disfiguring,' etc. shows use of higher level language that is not consistent with impairment of intellectual quotient (IQ) of 70 or below (mental retardation)." Ex. D (Ferranti Rpt. at 5).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    his difficulties and told me that representing himself would
     be a "stupid thing to do."

2    2.    It is my opinion that due to the significant amount of time
3          required for Mr. Gardner to express himself and for his
           audience to get clarification on his remarks that the essential
4          principles of fairness for the defendant and efficiency for the
           State of California in trying him for serious crimes, would
5          both be at risk by allowing this defendant to represent
           himself.  It is my opinion that Mr. Gardner is mentally
6          impaired to the extent that the basic integrity of the
           proceeding would be jeopardized by going forward with
7          adjudication with him as pro per.

8    3.    Communication in court requires that decisions be made
           quickly and sometimes under pressure.  Decisions facing
9          defendants representing themselves include all the basic
           strategic and tactical choices of trial, such as what motions to
10         make, what witnesses to call, and what arguments to make to
           the jury.  Mr. Gardner clearly lacks the ability to
11         communicate clearly.  In addition, Mr. Gardner demonstrates
           a lack of ability to incorporate new ideas (learn) and adapt
12         strategically.  For example, when asked what he would do if
           the Judge does not "throw out" his confession to [the] police,
13         Mr. Gardner was stumped.  He did not know what he would
           reasonably do to defend himself if his confession is admitted
14         in a court trial.  Lack of ability to foresee possible outcomes
           and shift one's basic defensive strategy is an important basic
15         competency for the proper per defendant.  Mr. Gardner lacks
           this ability.

16   4.    Although in my opinion Mr. Gardner is competent to waive
           his right to counsel and understand the potential risks and
17         benefits of doing so, he does not demonstrate the higher
           cognitive abilities necessary to litigate his case in court.
18         Although Mr. Gardner does not meet criteria for mental
           retardation or borderline intellectual functioning, his
19         intelligence is limited.  He does not exhibit the ability for
           abstract thinking, higher level problem solving or cognitive
20         flexibility.  His ability to be educable and process
           information is limited.  For example, he was not educable on
21         important legal topics such as his own legal culpability
           related to his volitional substance abuse.  This demonstrates
22         Mr. Gardner's inability to understand important issues
           pertinent to the court proceedings.

23

24   Ex. D (Ferranti Rpt. at 16-17).

25        Based on Dr. Ferranti's assessment, on July 20, 2011, the trial court found Mr. Gardner

26   competent to stand trial.  *See* 1 RT 15 (finding that Mr. Gardner "is presently able to understand

27   the nature and the purpose of the proceedings taken against him and is able to assist with and

28   cooperate with counsel in presenting a defense").  The trial court, however, did not clearly address

8

1   the issue of Mr. Gardner's competence to represent himself.

2          Approximately six months later – and only some two months before trial – the trial court

3   heard a defense motion to continue the trial and, during this hearing, defense counsel told the court

4   that Mr. Gardner wanted to represent himself at trial.  The trial court informed Mr. Gardner that

5              [i]t's my understanding from your attorney that you have been
            evaluated and the doctor felt that you had difficulty understanding
6            the complexity of putting on a trial, as to whether or not you were
            competent to represent yourself.
7
            This doctor . . . made the assessment that you would not be able to
8            litigate your case in court because of the cognitive disabilities you
            have – meaning higher processes – not that you can't understand
9            what is going on, but it's more complicated.

10  1 RT 30-31.

11         Mr. Gardner replied that he felt he could "do it now because this case is two years old; and

12  I've been preparing."  1 RT 31.  The Court responded: "Well I did re-read Dr. [Ferranti's]

13  evaluation; and based on my assessment of that and [defense counsel's] interaction with you, I am

14  finding that your mental state is about the same as when Dr. [Ferranti] evaluated you.  So I am

15  denying your *Faretta*."  1 RT 31.

16         Mr. Gardner appealed the trial court's ruling to the state appellate court.  The appellate

17  court affirmed the trial court's decision.  It acknowledged that "we do not have a defendant who

18  wrote and presented the court with 'bizarre' documents" and "[w]e do not have a record of bizarre

19  or disruptive behavior in the courtroom."  Ex. A (Order at 16).  Nevertheless, the court found that

20  there was "substantial evidence" to support the trial court's ruling that Mr. Gardner was not able to

21  represent himself.  Ex. A (Order at 16).

22             Here, the trial court considered Dr. Ferranti's report, which
            determined with "reasonable medical certainty" that defendant was
23            incompetent to represent himself at trial.  In her report, Dr. Ferranti
            echoed the sentiments of the APA amicus brief [in *Edwards*], noting
24            that defendant suffered from an "Expressive Language Disorder"
            that prevented him from coherently communicating with the court or
25            a jury.  Dr. Ferranti also reported that defendant did not demonstrate
            "the higher cognitive abilities necessary to litigate his case in
26            court." . . .

27             . . . . As its comments indicated, the trial court clearly believed that
            defendant, due to his mental illness, was not capable of carrying out
28            the basic tasks required to present a defense – tasks such as

**United States District Court**
For the Northern District of California

9

> organizing a defense, making motions, and questioning witnesses.
> Because defendant was not obstreperous in court and otherwise
> lucid in his demeanor, the trial court's decision here was of
> necessity more finely tuned.  There is absolutely no indication that
> the trial court denied defendant's *Faretta* motion for reasons of
> efficiency or merely to level the playing field.  The trial court
> obtained expert evaluation . . . and relied on that evaluation, as well
> as considered defense counsel's concerns.  We will not second-
> guess that decision.

Ex. A (Order at 16-17).

Mr. Gardner now challenges the assessments made by the state courts.

To the extent Mr. Gardner is arguing the state courts erred in finding that he had an expressive language disorder or a cognitive deficiency, he is not entitled to any habeas relief. Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  The state courts determined that Mr. Gardner suffered from expressive language disorder and had a cognitive deficit based on the evaluation of a third-party medical expert, Dr. Ferranti.  That Mr. Gardner may have been sufficiently articulate during some of the proceedings does not constitute clear and convincing evidence that he did not have the disorder or cognitive problems, as Dr. Ferranti concluded.

To the extent Mr. Gardner is arguing the state courts improperly found him to be mentally incompetent because of the expressive language disorder and cognitive deficits, he is no better off. As a preliminary matter, the conclusion of mental incompetence is a factual finding.  *Cf. Cuen v. Evans*, 390 Fed. Appx. 721, 722 (9th Cir. 2010) (stating that the issue of competence to stand trial is a factual question such that review is for an unreasonable determination of the facts in light of the evidence presented in the state court proceeding under § 2254(d)(2)); *see also Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (in a case involving competency to stand trial, indicating that the competency issue was a factual one).  Thus, habeas relief is barred on grounds similar to above; that is, the incompetency finding has a presumption of correctness, and Mr. Gardner has not submitted clear and convincing evidence to the contrary.

Even if competency were a mixed issue of law and fact, such that the presumption of correctness under § 2254(e)(1) would not apply, *see Lambert v. Blodgett*, 393 F.3d 943. 976 (9th

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Cir. 2004) (stating that "the reach of the presumption of correctness in new § 2254(e)(1) is restricted to pure questions of historical fact[;] [s]tate decisions applying law to facts are governed by § 2254(d)(1)), Mr. Gardner still would fare no better.

Here, Mr. Gardner's main argument is that, even if he has a mental disorder or deficiency of some kind, as a matter of law, that is not the kind of severe mental illness that, under *Edwards*, would render a defendant incompetent to conduct a trial by himself.  *See Edwards*, 554 U.S. at 178 (stating that "the Constitution permits Sates to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves").  Mr. Gardner notes that, in *Edwards*, the defendant had schizophrenia.[5]  But the Supreme Court did not, in *Edwards*, define what constitutes a severe mental illness.  *See, e.g.*, *United States v. McKinney*, 737 F.3d 773, 778 (D.C. Cir. 2013) (noting that, "in *Edwards*, the Supreme Court expressly declined to define . . . 'severe mental illness'").  Moreover, as the California appellate court expressly recognized in its opinion, the *Edwards* Court indicated agreement with the APA that "'[d]isorganized thinking, . . . impaired expressive abilities, . . . and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant.'" *Edwards*, 554 U.S. at 176 (quoting APA amicus brief).  Given *Edwards*'s focus on the functional limitations which impair self-representation, the Court cannot conclude, under § 2254(d)(1), that the California appellate court's decision (*i.e.*, upholding the trial court's determination that Mr. Gardner was not competent to conduct his own trial defense) was an unreasonable application of clearly established federal law as determined by the Supreme Court.  *See Hedlund*, 750 F.3d at 799 (stating that "relief is proper only 'in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents'").

---

[5] He also notes that, in a Ninth Circuit decision, the defendant had a bipolar disorder and still the court found him competent to represent himself.  *See United States v. Schiff*, 383 Fed. Appx. 649, 650 (9th Cir. 2010) (stating that defendant's "afflictions did not prevent him from adequately conducting his own defense[;] [he] had a coherent trial strategy, offered rational defenses, conducted cross-examinations, direct examinations, and made a closing argument").

United States District Court
For the Northern District of California

This is particularly true given that, in *Edwards*, the Supreme Court underscored that the trial judge "will often prove best able to make more fine-tuned mental capacity decisions tailored to the individualized circumstances of a particular defendant." *Edwards*, 554 U.S. at 177. *See, e.g.*, *McKinney*, 737 F.3d at 778-79 (rejecting defendant's argument that his personality disorder should have qualified as a severe mental illness because "the district court determined that [his] psychological impairment – whatever diagnostic form it took – was insufficiently severe" and "we have no reason to disturb the district court's 'fine-tuned' judgment").

C.    Fifth Amendment Claim

Mr. Gardner argues that, even if he has no viable claim for relief based on the Sixth Amendment right to self-representation, he still has a meritorious claim based on a violation of his Fifth Amendment right against self-incrimination. This claim is based on inculpatory statements that Mr. Gardner made during his third police interview on the morning of March 10, 2010 (a Wednesday), which took place several days after he was arrested on March 6, 2010 (Saturday). According to Mr. Gardner, those statements would never have been made but for the fact that he was not promptly arraigned after his arrest on March 6; instead, the police deliberately delayed his arraignment until the afternoon of March 10 so as to extract a confession from him – in particular, after interviewing the others involved in the incident (*i.e.*, Big Tim, Little Tim, and Melody). Mr. Gardner maintains that the delayed arraignment amounted to improper coercion, thus rendering his confession involuntary. According to Mr. Gardner, "[h]aving spent four nights in jail without going to court or being formally charged with any crime, [he] would logically believe[] that the only way he could end his detention is by telling the police what they wanted to hear." Pet. at 8. Mr. Gardner adds that he was in a particularly vulnerable state because, "[f]ive days into his extended detention, [he] was likely experiencing serious withdrawal symptoms caused by his methamphetamine and alcohol addictions." Pet. at 9.

The state appellate court rejected Mr. Gardner's Fifth Amendment claim, noting, *inter alia*, that, even if a delay in arraignment is not reasonable, a delay is treated as only one factor in determining whether a confession was voluntarily made. The appellate court then considered other circumstances and found that the totality did not support an involuntary confession:

12

1
2
3
4
5
6
7
8
9
10

> [T]here is no suggestion that defendant's statements were involuntary under the *Miranda* rules or in the traditional sense. The record discloses that defendant was properly advised of his rights and he voluntarily, knowingly, and intelligently waived them. Defendant offers nothing to support his contention that his statements were coerced. Rather, he speculates that he was "likely experiencing" symptoms of his methamphetamine addiction at the time he made his statements. He further claims that he is a "man of limited intelligence" and "the sole purpose" of the "unnecessarily long delay" was to "extract a confession." There is no evidence, however, that defendant's March 10, 2010, statement was caused by any prolonged, or otherwise improper, interrogation tactics or attributable to any withdrawal symptoms. Rather, the record reflects that defendant previously gave statements on two prior occasions, each time providing limited information about the crime. It was only after he learned that the police had been talking to his confederates, including his wife, that he decided to confess his involvement in the crime.

11   Ex. A (Order at 19).

12          The state appellate court's decision was not contrary to, not did it involve an unreasonable

13   application of, clearly established federal law as determined by the Supreme Court. The court

14   correctly noted that a delay in arraignment is "merely one factor to be considered in evaluating the

15   overall voluntariness of [a] statement." *Brown v. Jackson*, 501 Fed. Appx. 376, 379 (6th Cir.

16   2012) (also stating that such a delay "is not, in and of itself, a sufficient basis for suppressing [a]

17   statement"). Furthermore, the court considered the totality of the circumstances in evaluating the

18   voluntariness of Mr. Gardner's statements on March 6, 2010, *see Withrow v. Williams*, 507 U.S.

19   680, 693 (1993) (stating that, "[u]nder the due process approach, . . . courts look to the totality of

20   the circumstances to determine whether a confession was voluntary"), including but not limited to

21   whether Mr. Gardner was experiencing any withdrawal symptoms on that date. The court

22   implicitly found Mr. Gardner was not experiencing any withdrawal symptoms because it indicated

23   that Mr. Gardner's claims to that effect (or rather, in his words, that he *likely* was experiencing

24   symptoms) were speculative. The state court's finding is entitled to a presumption of correctness

25   under § 2254(e)(1), and Mr. Gardner has failed to offer clear and convincing evidence to the

26   contrary. *See Dassey v. Dittmann*, No. 14-CV-1310, 2016 U.S. Dist. LEXIS 106971, at *76 (E.D.

27   Wis. Aug. 12, 2016) ("'Though the voluntariness of a confession is an issue of law, the factors

28   underlying that determination are issues of fact to which § 2254(e)(1)'s presumption of correctness

**United States District Court**
For the Northern District of California

1    applies.'"); *see also Knaubert v. Goldsmith*, 791 F.2d 722, 726-27 (9th Cir. 1986) ("In *Miller v.*

2    *Fenton*, 474 U.S. 104 (1985), the Supreme Court indicated that a state court's conclusion that a

3    confession was voluntary is a legal, not a factual, conclusion.  As such, it is not entitled to a

4    presumption of correctness under [then] 28 U.S.C. § 2254(d).  We must, then, determine whether

5    the state courts made any factual finding upon which the district court could rely in concluding

6    that the confession was voluntary.").  Nothing in the record supports Mr. Gardner's position that

7    he experienced withdrawal symptoms related to alcohol.  *See, e.g.*, Ex. D (Dr. Ferranti Rpt. at 10)

8    (not diagnosing alcohol dependence because she "was not able to elicit substantive evidence of

9    withdrawal symptoms related to alcohol or tolerance to alcohol").

10            As for methamphetamine, Dr. Ferranti did in her July 2011 report note that Mr. Gardner

11    had self-reported "experiencing classic withdrawal[] symptoms related to methamphetamine when

12    he reported 'crashing' and sleeping for many days at a time after using methamphetamine," and

13    thus she diagnosed Mr. Gardner with amphetamine dependence.  Ex. D (Ferranti Rpt. at 11).

14    While Dr. Ferranti's report thus indicates that it was possible for Mr. Gardner to be experiencing

15    withdrawal symptoms related to methamphetamine (a year earlier) on March 6, 2010, it was not

16    unreasonable for the state appellate court to find the matter speculative, particularly in the absence

17    of any corroborating evidence.  Other than Mr. Gardner's speculation that he was "likely

18    experiencing" withdrawal symptoms, he provided no specific description of his condition, nor is

19    there any eye witness testimony or medical records supporting his claim, particularly during the

20    timeframe in question.  In short, Mr. Gardner has failed to offer clear and convincing evidence to

21    overcome the presumption that the court's factual finding was correct.[6]  Notably, a *Miranda*

22    warning was given, *see* 4 CT 963, and Mr. Gardner has pointed to nothing else that would indicate

23

24    _____

       [6] In his reply brief, Mr. Gardner argues for the first time that there were other circumstances that
25    created coercion – in particular, the fact that he had already been interviewed twice and the fact
       that he suffered from mental disorders, as found by Dr. Ferranti.  But neither of these
26    circumstances is compelling.  Although Mr. Gardner had already been interviewed twice, the
       police gave him a *Miranda* warning before interviewing him a third time.  Also, Mr. Gardner's
27    mental disorders were largely related to his ability to express himself.  *See also* Ex. D (Ferranti
       Rpt. at 5) (noting that Mr. Gardner's use of certain legal terms "shows use of higher level
28    language that is not consistent with impairment of intellectual quotient (IQ) of 70 or below
       (mental retardation)").

involuntariness.  *See, e.g.*, *Withrow*, 507 U.S. at 693-94 (noting that "potential circumstances include not only the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health [and] the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation").

Moreover, even if Mr. Gardner's statements on March 6, 2010, constituted an involuntary confession, Mr. Gardner would have to show harmful error in order to be entitled to relief.  In his papers, Mr. Gardner argues that he is entitled to relief unless the constitutional error was harmless beyond a reasonable doubt.  *See* Pet. at 9 (citing *Chapman v. California*, 386 U.S. 18 (1967)).  But the *Chapman* standard applies only on direct appeal.  "On collateral review, the test [as articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993)] is whether the error had a substantial and injurious effect or influence in determining the jury's verdict."  *Nguyen v. McGrath*, 323 F. Supp. 2d 1007, 1017 (N.D. Cal. 2004) (internal quotation marks omitted); *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (noting that *Brecht* standard applies in § 2254 proceedings "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*").  *See, e.g.*, *Doody v. Ryan*, 649 F.3d 986, 1021-22 (9th Cir. 2011) ("On habeas review, once we determine . . . that the state court's voluntariness determination was an unreasonable application of Supreme Court precedent, we turn to the consideration of whether the error was harmless [– *i.e.*,] 'whether the confession likely had a substantial and injurious impact on the verdict.'").  The *Brecht* standard has not been met in the instant case.  Even if the statements that Mr. Gardner had made on March 6, 2010, were excluded, the jury would still have been presented with evidence that Melody, Mr. Wise's wife, told a police officer that Mr. Gardner had tightened Eric's restraints.  Melody also stated that she overheard a conversation between Mr. Gardner and Big Tim during which "Big Tim instructed [Mr.] Gardner to tighten the restraints because Little Timmy didn't know what he was doing."  6 RT 987.  Under these circumstances, the Court is not "left with grave doubt about whether a constitutional error substantially influenced the verdict."  *Slovik v. Yates*, 556 F.3d 747, 755 (9th Cir. 2009) (internal quotation marks omitted).

1          Finally, Mr. Gardner argues that, even if his confession on March 6, 2010, was deemed

2  voluntary, he still has a valid due process claim under *Hicks v. Oklahoma*, 447 U.S. 343 (1980),

3  based on the fact that his arraignment may have been delayed several hours after the time limit set

4  forth under California law.  In *Hicks*, the Supreme Court held that, where state law provides for a

5  liberty interest, the state cannot arbitrarily deprive an individual of that interest.  *See id.* at 346

6  (stating that a defendant "has a substantial and legitimate expectation that he will be deprived of

7  his liberty only to the extent determined by the jury in the exercise of its statutory discretion [as

8  provided for under state law], and that liberty interest is one that the Fourteenth Amendment

9  preserves against arbitrary deprivation by the State"); *see also Marsh v. County of San Diego*, 680

10  F.3d 1148, 1157 (9th Cir. 2012) (citing, *inter alia*, *Hicks* for the proposition that "statutory laws of

11  general applicability *can* create a liberty interest that is constitutionally protected") (emphasis in

12  original); *Parker v. Pliler*, 307 Fed. Appx. 81, 82 (9th Cir. 2009) (stating that, under *Hicks*, "[t]he

13  Due Process Clause of the Fourteenth Amendment does . . . protect against the 'arbitrary

14  deprivation' of a liberty interest to which a defendant is 'entitled under state law'").  Mr. Hicks

15  points out that, under California Penal Code § 825(a)(1), a "defendant shall in all cases be taken

16  before the magistrate [*i.e.*, for arraignment] without unnecessary delay, *and, in any event, within*

17  *48 hours after his or her arrest, excluding Sundays and holidays*."  Cal. Pen. Code § 825(a)(1)

18  (emphasis added).  Mr. Hicks contends that he was deprived of the rights provided for in §

19  825(a)(1) because, as he was arrested on a Saturday (March 6, 2010), he should have been

20  arraigned at the latest on Wednesday *morning*.  (The 48 hours would cover Monday and Tuesday.)

21  Instead, he was arraigned on Wednesday *afternoon*, after he had given his third police interview

22  and made inculpatory statements.

23          Even assuming that § 825(a)(1) creates a liberty interest protected by the due process

24  clause, [7] Mr. Gardner is not entitled to relief.  Section 825(a)(2) goes on to explain the scope of the

25  (assumed) liberty interest:

26

27  ————————————

[7] Mr. Gardner has not cited to any authority indicating that a violation of § 825(a)(1) can be a due

28  process violation.  At best, Mr. Gardner cites state authority addressing only violations of state law, not federal constitutional law.

United States District Court
For the Northern District of California

> When the 48 hours prescribed by paragraph (1) expire at a time when the court in which the magistrate is sitting is not in session, that time shall be extended to include the duration of the next court session on the judicial day immediately following.  If the 48-hour period expires at a time when the court in which the magistrate is sitting is in session, the arraignment may take place at any time during that session. . . .

Cal. Pen. Code § 825(a).

Mr. Gardner does not contest that, in his case, the 48 hours expired at the end of the day, Tuesday, March 5, 2010.  Thus, the question is when the first court session was on Wednesday, March 6, 2010.  Mr. Gardner was arraigned on the afternoon of Wednesday, March 6.  The state appellate court pointed out, "[t]o the extent defendant insists that he should have been arraigned on Wednesday *morning* instead of the afternoon, the record is silent regarding whether the magistrate was available for a morning session."  Ex. A (Order at 18) (emphasis in original).  Mr. Gardner does not dispute this fact.  Given this uncontested fact, the appellate court's decision cannot be deemed unreasonable.  *See Hedlund*, 750 F.3d at 799 (stating that, where a petitioner challenges the application of clearly established federal law, "our task under AEDPA is not to decide whether a state court decision applied the law correctly[;] [r]ather, we must decide whether the state court decision applied the law reasonably").

Moreover, even if there were a *Hicks* due process violation as claimed by Mr. Gardner, he has failed to show prejudice for the reasons stated above.  *See Crew v. Davis*, No. 12-CV-4259 YGR, 2015 U.S. Dist. LEXIS 160415, at *31 (N.D. Cal. Nov. 30, 2015) (noting that, "[e]ven if a petitioner meets the requirements of section 2254(d), habeas relief is warranted only if [under *Brecht*] the constitutional error at issue had a substantial and injurious effect or influence in determining the jury's verdict").

### III.   CONCLUSION

For the foregoing reasons, the Court denies Mr. Gardner's petition for habeas relief.  The Court also declines to issue a certificate of appealability.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (noting that a habeas petition must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal

1  quotation marks omitted).

2      The Clerk of the Court is instructed to enter judgment in accordance with this opinion and

3  close the file in this case.

4

5      **IT IS SO ORDERED**.

6

7  Dated: December 15, 2016

8  _____

9  EDWARD M. CHEN
   United States District Judge

United States District Court
For the Northern District of California